1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

9
10

DEON DESHAWN BROADWAY,

11
            Plaintiff,

12
      v.

13
CAROLYN W. COLVIN,

14
Acting Commissioner of Social Security,

15
            Defendant.

16
17
18

_____/

Case No.  1:13-cv-00793-SKO


ORDER ON PLAINTIFF'S COMPLAINT


(Docket No. 1)

19
20

## I.  INTRODUCTION

21        Plaintiff Deon Deshawn Broadway ("Plaintiff") seeks judicial review of a final decision of

22 the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his

23 application for Supplemental Security Income ("SSI") disability benefits pursuant to Title XVI of

24 the Social Security Act.  42 U.S.C. § 1383(c)(3).  The matter is currently before the Court on the

25 parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto,

26 United States Magistrate Judge.[1]

27
28
_____
[1]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 8, 9.)

1

## II. BACKGROUND

2       Plaintiff was 41 at the time of his hearing.  (AR 52.)  He lives with his mother and sleeps

3 on the couch.  Plaintiff attended school until seventh grade, and did not earn a General

4 Educational Development ("GED") certificate.  (AR 52.)  Plaintiff contends he cannot work due

5 to schizophrenia, depression, lower back pain, arthritis in his right hand, and arthritis in his right

6 knee.  (AR 56-57.)  Plaintiff asserts he has not worked since 2000 except for "picking up paper"

7 for several hours a day.  (AR 52-53.)

8 **A.      Relevant Medical History**

9       In October 2008, Plaintiff presented to Golden Valley Health Centers ("GVHC") with

10 pain in his back and legs.  (AR 345).  Plaintiff reported he had stopped taking his medication two

11 weeks prior, was hearing voices, and was depressed.  In December 2008, Plaintiff again presented

12 to GVHC for psychological medications, and with pain in his back and legs.  (AR 344.)  In

13 October 2009, Plaintiff presented to GVHC for psychological medication refills, and with low

14 back pain.  (AR 343.)  Plaintiff reported being off his medication for one or two months.  An

15 examination revealed that Plaintiff was in no acute distress and had a negative straight leg raising

16 test with good sensation.  In February 2010, Plaintiff presented to GVHC with lower back pain.

17 (AR 394.)  Plaintiff was well nourished, well developed, fully oriented, and in no acute distress.

18 Inspection of the lumbar spine revealed normal lumbar lordosis (spine curvature), normal range of

19 motion, stable lumbar spine, tenderness in the right lower extremity but no joint instability, and

20 internal derangement in the right knee.  (AR 394-95.)  In March 2010, Plaintiff presented to

21 GVHC for prescription refills, and reported being out of medication for two weeks.  (AR 391.)

22 Upon examination, Plaintiff was found to be well nourished, well developed, fully oriented, and

23 in no acute distress.  (AR 392.)  In June 2010, Plaintiff reported back pain and requested refills of

24 his psychiatric medications and Vicodin.  (AR 387.)  Treatment notes indicated that a previous

25 urinalysis was positive for cocaine and methamphetamine, although Plaintiff denied using any

26 substances.  (AR 387.)  Again, Plaintiff was well nourished, well developed, fully oriented, and in

27 no acute distress.

28

1        On April 27, 2010, R. Fast, M.D., a state agency physician, reviewed the record and

2  completed a Physical Residual Functional Capacity Assessment.  (AR 352-56.)  Dr. Fast stated

3  that Plaintiff could occasionally lift and carry up to 50 pounds, frequently lift and carry up to 25

4  pounds, stand, walk, and sit about six hours in an eight-hour workday, had no push or pull

5  limitations, and no postural, manipulative, visual, or environmental limitations.  (AR 352-56.)

6        On May 10, 2010, Paul Y. Klein, Psy.D., completed a Mental Residual Functional

7  Capacity Assessment and Psychiatric Review Technique Form.  (AR 360-63, 365-78).   Dr.

8  Klein found Plaintiff markedly limited in his ability to carry out detailed instructions.  He also

9  found Plaintiff moderately limited in his abilities to (1) understand and remember detailed

10  instructions; (2) perform activities within a schedule, maintain regular attendance, and be

11  punctual; (3) sustain an ordinary routine without special supervision; (4) complete a normal

12  workday and workweek without interruptions from psychologically based symptoms;  and (5)

13  perform at a consistent pace without unreasonable number and length of rest periods.  (AR 360-

14  61.)  Plaintiff was mildly limited in activities of daily living and social functioning.  Plaintiff

15  was moderately limited in concentration, persistence, and pace, and there was insufficient

16  evidence regarding repeated episodes of decompensation.  (AR 375.)  Dr. Klein noted that

17  Plaintiff's symptoms were well controlled with medication.  (AR 377.)  Dr. Klein concluded that

18  Plaintiff (1) had adequate memory, understanding, and sustained concentration, persistence, and

19  pace for simple 1-2 step tasks; (2) could accept simple instructions from supervisors; (3) could

20  interact with co-workers with minimal public contact; and (4) could adapt to infrequent change

21  in routine work-like settings.  (AR 362.)  On August 24, 2010, Randall J. Garland, Ph.D.,

22  affirmed this opinion.  (AR 403.)

23        On July 30, 2010, H.M. Estrin, M.D., a state agency physician, reviewed the record and

24  completed a Physical Residual Functional Capacity Assessment.  (AR 396-400.)  Dr. Estrin

25  found that Plaintiff could occasionally lift and carry up to 50 pounds; frequently lift and carry up

26  to 25 pounds; stand, walk, and sit about six hours in an eight-hour workday; and was limited in

27  pushing and pulling in his lower extremities.  (AR 397.)  Dr. Estrin opined that Plaintiff could

28  frequently stoop and crouch, and occasionally climb, balance, kneel, and crawl.  (AR 398.)

1  Plaintiff had no manipulative, visual, or communicative limitations.  (AR 398-99).  Plaintiff was

2  to avoid hazards (machinery, heights, etc.).  (AR 399.)

3     In August 2010, Plaintiff presented to GVHC three times.  (AR 414-20.)   On August 2,

4  2010, the treatment provider noted that Plaintiff was comfortable moving about the room.  An

5  examination of his back revealed that Plaintiff had full flexion but was limited to 10 degrees on

6  extension.  (AR 419.)  On August 25, 2010, Plaintiff reported doing "fairly good" on his current

7  medications, indicated his sleep was fine, and that he continued to hear "noises."  (AR 417.)

8  Upon mental examination, Plaintiff was fully oriented with normal appearance, neat grooming,

9  casual dress, fair eye contact, normal speech, normal attention, sad mood, constricted affect,

10 linear thought process, and fair insight and judgment.  (AR 414, 417.)   In September 2010,

11 Plaintiff reported doing well after an increase in medication.  (AR 413.)

12    In February 2011, Plaintiff presented as a new patient with Stanislaus County Health

13 Services Agency with complaints of schizophrenia and chronic low back pain.  (AR 439-40, 441-

14 45).  Plaintiff reported his schizophrenia was controlled; the treatment provider prescribed a low

15 dose of Vicodin to treat his low back pain.  (AR 439.)  Upon examination, Plaintiff was alert, well

16 nourished, in no acute distress, and had no edema in his extremities.  (AR 439.)  Plaintiff reported

17 taking out the trash once a day for exercise, and asserted he had never used intravenous or other

18 drugs.  (AR 443.)  In March 2011, Plaintiff's schizophrenia was stable.  (AR 436.)  In April 2011,

19 Plaintiff reported talking to himself, being depressed, and crying a lot; his treatment provider

20 continued his medications at the same dosages.  (AR 434.)   In May 2011, Plaintiff reported

21 having pain in his back and in both knees for about three weeks.  (AR 427.)  Upon examination,

22 Plaintiff was alert, fully oriented, well nourished, and in no acute distress.  (AR 427, 430.)  His

23 right knee had a reduced range of motion, with some tenderness and swelling.  (AR 427.)

24 Plaintiff also had a reduced range of motion in the right wrist but no tenderness, and the nerves

25 were intact.  (AR 427.)  In June 2011, an X-ray of the right knee indicated some degenerative

26 changes in the medial joint compartment and patellofemoral joint with bony osteophyte formation

27 and some joint space narrowing.  (AR 452.) There was no significant joint effusion present.

28 Plaintiff reported that his right knee pain was worsening; upon examination, there was crepitation

1    but no swelling.  (AR 423.)   Plaintiff was referred to a sports medicine clinic for a Synvisc

2    injection in June 2011.  (AR 423.)

3          David Sandoval, Licensed Clinical Social Worker ("LCSW"), initially met with Plaintiff

4    briefly on February 10, 2011; they agreed to take a more detailed history in a follow-up visit.

5    (AR 438.)  In April 2011, Plaintiff reported that he started hearing voices when he was in his

6    20s, that he had "a lot of depression," and did not sleep well at night because of headaches and

7    auditory hallucinations.  (AR 435.)  Plaintiff stated that the medications were helping a little but

8    he was still hearing voices and not sleeping well.  (AR 433.)  In May 2011, Plaintiff reported

9    things were much better (AR 431), but by July 2011, Plaintiff was not doing well and still

10   hearing voices (AR 421).  In September 2011, Plaintiff reported that things at home were bad

11   and he still heard voices, and that sometimes he hid in the closet to feel safe.  (AR 464.)   On

12   September 29, 2011, Mr. Sandoval wrote a letter in anticipation of Plaintiff's SSI hearing, stating

13   that Plaintiff reported hearing voices and feeling depressed.  (AR 459.)  Mr. Sandoval stated that

14   Plaintiff had a hard time following directions, was depressed all the time, and was easily

15   frustrated.  (AR 459.)  Mr. Sandoval also stated that Plaintiff was diagnosed with Schizoaffective

16   Disorder and Borderline Intellectual Function by the Psychiatry unit at the clinic.  Plaintiff also

17   had limited mobility because of knee problems and wrist pain.  Given Plaintiff's history and

18   diagnoses, Mr. Sandoval did not believe Plaintiff could work in a meaningful way.  (AR 459.)

19         On September 6, 2011, Dr. Walker, Plaintiff's treating physician, completed an

20   assessment at the request of Plaintiff's attorney. (AR 453-56.)  Dr. Walker diagnosed Plaintiff

21   with schizophrenia and degenerative joint disease in the right knee.  (AR 453).  Dr. Walker

22   stated that Plaintiff had a good ability to maintain personal appearance, behave in an emotionally

23   stable manner, relate predictably in social situations, demonstrate reliability, relate to co-workers,

24   and deal with the public.  (AR 454-55.)  Dr. Walker also found Plaintiff had a poor ability to

25   follow work rules, use judgment, deal with work stress, function independently, and maintain

26   attention and concentration.  (AR 455.)  Dr. Walker opined that Plaintiff's impairments would

27   affect his ability to lift heavy objects and that Plaintiff was incapable of performing full-time

28   work at any exertion level.  (AR 454, 456.)  He opined that Plaintiff could sit for more than one

1   hour and stand for less than one hour in an eight-hour work day.  (AR 456.)  Dr. Walker opined

2   that these limitations had been ongoing for more than a year.

3   **B.    Administrative Proceedings**

4          Plaintiff protectively filed an SSI application on December 28, 2009, alleging disability

5   since May 30, 1998.  (AR 96-97, 192-95.)  The agency denied Plaintiff's application for benefits

6   initially on May 13, 2010, and again on reconsideration on September 2, 2010.  (AR 112-16, 121-

7   25.)  On October 5, 2011, Plaintiff appeared with counsel and testified before an administrative

8   law judge ("ALJ").  (AR 47-87.)  In a decision dated December 9, 2011, the ALJ found that

9   Plaintiff was not disabled.  (AR 22-31.)  The ALJ's decision became the final decision of the

10  Commissioner when the Appeals Council denied Plaintiff's request for review on March 28,

11  2013.  (AR 1-6.)

12         **1.    Plaintiff's Testimony**

13         Plaintiff testified he was 41 years old at the time of the hearing and lived with his parents.

14  (AR 52, 66-67.)  Plaintiff attended school until the seventh grade, and had not earned a GED.

15  (AR 52.)  He could not read a newspaper.  (AR 52.)   Plaintiff stopped attending school because

16  he was depressed, and had not attempted to earn a GED because of voices he was hearing.  (AR

17  63.)  Plaintiff had experienced auditory and visual hallucinations "[p]ractically all [his] life,"

18  "[s]ince [he] was seven, seven or eight," and was "scared to death of them . . . ."  (AR 64.)

19  However, Plaintiff did not take any medication specifically for these hallucinations and had only

20  started talking with others about the voices six years prior because he had been ashamed.  (AR

21  65.)  Plaintiff dealt with hearing voices by lying in the closet in his mother's room for up to 20

22  minutes, which sometimes helped eliminate the hallucinations.  (AR 65-66, 68-69.)  Plaintiff

23  testified that the voices were getting worse all the time.  (AR 81.)

24         Plaintiff testified that he could not work because of schizophrenia, auditory

25  hallucinations, depression, lower back pain, arthritis in his right hand, and problems with his

26  right knee.  (AR 56-57.)  Plaintiff had been referred for injections to relieve his knee pain, but

27  had not received any injections.  (AR 57.)  Plaintiff was compliant with his medication for his

28  schizoaffective and bipolar disorders. (AR 59.)   Asthma affected Plaintiff's ability to work

1  because he had asthma attacks without warning, which immobilized him and required him to sit

2  down.  (AR 60.)   Plaintiff had an inhaler, but did not carry it with him at all times, and had been

3  hospitalized once in the previous six years due to an asthma attack.    (AR 60-62.)

4  Gastrointestinal problems kept Plaintiff from working because his "stomach stay[ed] bloated a

5  lot."  (AR 62.)  Plaintiff also had a seizure disorder and "[t]he seizures come and go so it's not

6  wise for [him] to work with the seizures."  (AR 69.)  Plaintiff was compliant with his seizure

7  medication and had not had a seizure in five years.  (AR 69-70.)

8       Plaintiff initially testified that he last worked in 2000, but then stated that he had also

9  worked since then "[p]icking up paper" for about three hours a day.  (AR 52-53.)  Although the

10  record indicated that Plaintiff had about $13,000 in earnings from self-employment in 2010,

11  Plaintiff claimed he was not self-employed or doing any work in 2010.  (AR 53-54.)  Plaintiff

12  explained it "could be possible" that someone else had been using his Social Security number

13  because he had been "jumping from house to house, place to place over the last five or six

14  years."  (AR 54-55.)

15       Plaintiff testified that during the day he watched television, but did not do any household

16  chores.  (AR 70.)  Plaintiff claimed that he was "not physically fit to do anything" and that he

17  was prevented by his "voices, [his] disability to pick up anything or hold anything."  (AR 71.)

18  Plaintiff is right-handed and had no problems with the left hand.  Plaintiff could lift five or six

19  pounds.  Plaintiff had no problems sitting but could stand for only two or three minutes on his

20  right leg.  Plaintiff could walk five or six minutes without pain.  (AR 72.)  Plaintiff testified that

21  he treated with Dr. Walker and Mr. Sandoval.  (AR 75.)  Plaintiff first stated that his mental

22  health care provider told him he could not work because of his auditory hallucinations, but later

23  stated he had never spoken with his mental health care provider about whether he could work.

24  (AR 77-78.)   However, Plaintiff testified that his general practitioner advised him it was

25  impossible for him to work.  (AR 78.)

26  **C.**       **The ALJ's Decision**

27       The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920.  (AR

28

24-31.)   The ALJ found that Plaintiff had not engaged in substantial gainful activity ("SGA") since December 28, 2009, the protective filing date (step one).  (AR 24.)  Plaintiff had the severe impairments of (1) schizoaffective disorder of the bipolar type, (2) cocaine dependence in partial remission, (3) internal derangement right knee, (4) anxiety, (5) depression, (6) obesity, (7) gastrointestinal esophageal reflux disease ("GERD"), (8) borderline intellectual functioning, (9) psychosis, and (10) history of seizure disorder (step two).  (AR 24.)  However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 24-25.)  The ALJ determined that Plaintiff had the residual functional capacity ("RFC")[2] to perform medium work, but he could not climb ladders, ropes, or scaffolds; could occasionally stoop, crouch or crawl; must avoid concentrated exposure to pulmonary irritants and hazards; could only have occasional interaction with the general public; and was moderately to markedly limited in the ability to understand, remember, or carry out complex or detailed job instructions.  (AR 26.)  Given his RFC, the ALJ determined that Plaintiff was capable of performing his past relevant work as a dishwasher (step four).  (AR 29.)  In the alternative, the ALJ determined that Plaintiff was not disabled because he could perform a significant number of other jobs in the national economy (step five).  (AR 29-30.)  In reaching his conclusions, the ALJ also determined that Plaintiff's subjective complaints were not fully credible.  (AR 27, 29.)

**D.      Plaintiff's Contentions on Appeal**

Plaintiff contends that the ALJ (1) improperly rejected Dr. Walker's opinion as Plaintiff's treating physician, (2) improperly rejected Mr. Sandoval's lay opinion as the LCSW who treated Plaintiff, (3) improperly found he had past work, (4) failed to meet his burden of proving Plaintiff was literate, and (5) erred by not obtaining vocational expert ("VE") testimony

---

[2] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

1 │ about his ability to perform work.

2 │ ### III.  SCOPE OF REVIEW

3 │      The ALJ's decision denying benefits "will be disturbed only if that decision is not

4 │ supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599,

5 │ 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

6 │ judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

7 │ Instead, the Court must determine whether the Commissioner applied the proper legal standards

8 │ and whether substantial evidence exists in the record to support the Commissioner's findings.  See

9 │ *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  "Substantial evidence is more than a mere

10 │ scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th

11 │ Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might

12 │ accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

13 │ (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must

14 │ consider the entire record as a whole, weighing both the evidence that supports and the evidence

15 │ that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a

16 │ specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.

17 │ 2007) (citation and internal quotation marks omitted).

18 │ ### IV.  APPLICABLE LAW

19 │      An individual is considered disabled for purposes of disability benefits if he or she is

20 │ unable to engage in any substantial, gainful activity by reason of any medically determinable

21 │ physical or mental impairment that can be expected to result in death or that has lasted, or can be

22 │ expected to last, for a continuous period of not less than twelve months.   42 U.S.C.

23 │ §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The

24 │ impairment or impairments must result from anatomical, physiological, or psychological

25 │ abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic

26 │ techniques and must be of such severity that the claimant is not only unable to do her previous

27 │ work, but cannot, considering her age, education, and work experience, engage in any other kind

28 │ of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3),

1 | 1382c(a)(3)(B), (D).

2 |      The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.  *Id*. §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.  *Id*. §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work.  *Id*. §§ 404.1520(f), 416.920(f).  If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id*. §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V. DISCUSSION

### A.    The ALJ's Treatment of Dr. Walker's Treating Opinion Was Proper

     Plaintiff contends the ALJ improperly rejected Dr. Walker's treating opinion without specific and legitimate reasons.  (Doc. 16, 6-7.)  Plaintiff asserts that if the ALJ found Dr. Walker's opinion ambiguous, the ALJ was required to contact Dr. Walker for clarification.  (Doc. 16, 7.)

     The Commissioner responds that the ALJ properly rejected Dr. Walker's opinion with specific and legitimate reasons.  (Doc. 17, 8.)  Further, the ALJ was not required to contact Dr. Walker because the ALJ found the evidence in the record supported a finding that Plaintiff was not disabled.  (Doc. 17, 9.)

1.      **Legal Standards Pertaining to Opinions of Treating Physicians**

"By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). "If a treating physician's opinion is 'well-supported . . . and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." *Id.* Even if a treating physician's opinion is not given controlling weight, the opinion is still entitled to deference and the ALJ must consider specified factors in determining the weight it will be given, including (1) the length of the treatment relationship and the frequency of examination, and (2) the nature and extent of the treatment relationship. *Id.* Additional factors relevant in evaluating the weight of any medical opinion, not just treating physician opinions, include: (3) the amount of relevant evidence that supports the opinion and the quality of the explanation provided, (4) the consistency of the medical opinion with the record as a whole, (5) the specialty of the physician providing the opinion, (6) and other factors such as the degree of understanding a physician has of Social Security disability programs and their evidentiary requirements and the physician's familiarity with other information in the record. *Id.*

If a treating physician's opinion is not contradicted by another doctor, it may only be rejected for clear and convincing reasons supported by substantial evidence. *Id*. at 632 (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Even if the treating physician's opinion is contradicted by another doctor, it may not be rejected unless the ALJ provides specific and legitimate reasons supported by substantial evidence. *Id.* (quoting *Reddick*, 157 F.3d at 725).

2.      **Dr. Walker's Opinion**

On September 6, 2011, Dr. Walker gave a medical source statement after a year of treating Plaintiff. (AR 453-55.) Dr. Walker diagnosed Plaintiff with right knee degenerative joint disease and schizoaffective disorder. (AR 453.) Dr. Walker found Plaintiff had limited ability to bear weight on the right knee, based on x-ray evidence and range of motion limitations. (AR pp. 453, 456.) The x-rays upon which Dr. Walker based this opinion were from a June 13, 2011, appointment with Ajit Najjar, M.D. The x-rays showed degenerative osteoarthritic changes predominantly in the medial joint compartment and patellar joint with bony osteophytic formation

1    and some joint space narrowing.  (AR 452.)    Dr. Walker determined Plaintiff would be limited

2    physically due to degenerative joint disease in his right knee, and mentally due to schizoaffective

3    disorder.  (AR 453.)  Specifically, Dr. Walker limited Plaintiff to lifting 10 pounds, and stated

4    Plaintiff could sit for approximately an hour without rest or support over an eight-hour period, and

5    could stand and/or walk less than an hour without rest or support or over an eight-hour period.

6    (AR 456.)    Mentally, Plaintiff had poor ability to follow work rules, use judgment, maintain

7    attention and concentration, function independently, or cope with work stress.  (AR 455.)

8              **3.      The ALJ Provided Specific and Legitimate Reasons for Rejecting Dr.**

9                       **Walker's Opinion**

10        Dr. Walker's opinion was contradicted by state agency reviewing doctors, who opined

11   Plaintiff could lift and carry 50 pounds occasionally, or 25 pounds frequently, in addition to being

12   able to sit, stand, and walk at least six hours during an eight-hour workday.    (AR 28.)

13   Accordingly, the ALJ was required to provide specific and legitimate reasons supported by

14   substantial evidence for rejecting Dr. Walker's treating opinion.

15        The ALJ first noted that Dr. Walker's assessment was not supported by references to

16   medical evidence.  (AR 28.)    An ALJ may discredit treating physicians' opinions that are

17   conclusory, brief, and unsupported by the record as a whole, or by objective medical findings.

18   *Batson v. Comm'r of Soc. Sec.,* 359 F.3d 1190, 1195 (9th Cir. 2004); *see* 20 C.F.R. §

19   416.927(c)(3) ("the more a medical source presents relevant evidence to support an opinion,

20   particularly medical signs and laboratory findings, the more weight we will give that opinion").

21   Here, although Dr. Walker noted that an x-ray of Plaintiff's right knee showed some

22   degeneration, these degenerative changes were mild and there was no significant joint effusion.

23   (AR 452-53.)

24        Second, the ALJ found Dr. Walker's opinion was internally inconsistent.  (AR 28.)  The

25   ALJ noted that Dr. Walker opined, on the one hand, that Plaintiff had a good ability to maintain

26   personal appearance, behave in an emotionally stable manner, relate predictably in social

27   situations, demonstrate reliability, relate to co-workers, and deal with the public.  On the other

28   hand, Dr. Walker opined that Plaintiff had poor ability to follow work rules, use judgment, deal

1  with work stress, function independently, and maintain attention and concentration.  (AR 28, 454-

2  55.)   The ALJ may disregard a treating physician's opinion that is internally inconsistent.

3  *Johnson v. Shalala,* 60 F.3d 1428, 1433 (9th Cir. 1995); *see* 20 C.F.R. § 416.927(c)(2), (4).

4        Finally, the ALJ noted that Dr. Walker's assessment did not describe how Plaintiff's

5  impairments specifically related to his functional limitations. (AR 28, 453-56.)  *See* 20 C.F.R. §

6  416.927(c)(3) ("[t]he better an explanation a source provides for an opinion, the more weight we

7  will give that opinion").

8        Plaintiff contends that Dr. Walker's opinion was in fact internally consistent.  (Doc. 16, 7.)

9  Plaintiff provides the following interpretation of Dr. Walker's opinion:  "the mental limitations

10 [assigned by Dr. Walker] were distinct from one another[,] with the poor ones related to the

11 schizoaffective disorder."  Plaintiff's interpretation of Dr. Walker's opinion differs from the ALJ's

12 interpretation that Dr. Walker's opinion was internally inconsistent because it indicated Plaintiff

13 had good ability to maintain personal appearance, behave in an emotionally stable manner, relate

14 predictably in social situations, demonstrate reliability, relate to co-workers, and deal with the

15 public, while at the same time indicating that Plaintiff had poor ability to follow work rules, use

16 judgment, deal with work stress, function independently, and maintain attention and concentration.

17 (Doc. 16, 7.)   Although Plaintiff's interpretation may be plausible, the plain reading of Dr.

18 Walker's opinion does not lend itself to Plaintiff's interpretation.  (AR 452-56.)  Dr. Walker does

19 not provide an explanation or any distinction between the limitations he imposed for Plaintiff's

20 schizoaffective disorder versus those imposed for Plaintiff's degenerative right knee.  (AR 452-

21 56.)  The ALJ's interpretation is rational and subject to deference.  *See Andrews v. Shalala*, 53

22 F.3d 1035, 1039-40 (9th Cir. 1995).

23       Plaintiff also contends the ALJ was required to contact Dr. Walker for clarification if the

24 ALJ found Dr. Walker's opinion was ambiguous.  (Doc. 16, 7.)   Social Security regulations

25 provide that the agency may recontact medical sources when there is "insufficient evidence to

26 determine whether [Plaintiff is] disabled . . . ." 20 C.F.R. § 416.920b.  Here, the ALJ reviewed the

27 record as a whole and, after Plaintiff's hearing, determined that the evidence in the record

28 supported a finding that Plaintiff was not disabled.  (AR 30.)   The ALJ was not required to

13

1    contact Dr. Walker for clarification on how Plaintiff's functional and mental limitations affected
2    Plaintiff's ability to work when the ALJ had sufficient evidence to determine whether Plaintiff
3    was disabled.  20 C.F.R. § 416.920b.

4         For the reasons above, the ALJ provided specific and legitimate reasons to reject Dr.
5    Walker's opinion, and did not err in doing so.

6    **B.     The ALJ's Treatment of Mr. Sandoval's Lay Opinion Was Proper**

7         Plaintiff contends the ALJ failed to provide germane reasons to reject Mr. Sandoval's
8    opinion as an "other source."  (Doc. 16, 7.)  The Commissioner responds that the ALJ provided
9    germane reasons to discredit Mr. Sandoval, and even if the Court found the ALJ's reasons invalid,
10   any error was harmless.  (Doc. 17, 11.)

11        **1.     Legal Standards**

12        A licensed clinical social worker is not considered an "acceptable medical source" under
13   the regulations.  *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223-24 (9th Cir. 2010); *see* 20
14   C.F.R. § 404.1513(a), (d).  The regulations treat "[p]ublic and private social welfare agency
15   personnel" as "other sources," 20 C.F.R. § 404.1513(d)(3), and the ALJ may expressly disregard
16   lay testimony if the ALJ "gives reasons germane to each witness for doing so." *Lewis v. Apfel,*
17   236 F.3d 503, 511 (9th Cir. 2001).   To reject an unacceptable source, also called an "other
18   source," the ALJ must give germane reasons.   *Turner*, 613 F.3d at 1224.

19        **2.     Mr. Sandoval's Opinion**

20        David S. Sandoval, LCSW, treated Plaintiff under the auspices of Healthways Clinic
21   beginning in February 2011.  (AR 421, 425, 431, 432-35, 438, 462-64.)  In a letter dated
22   September 29, 2011, Mr. Sandoval reiterated the diagnosis made by Healthways doctors that
23   Plaintiff had schizoaffective disorder and borderline intellectual functioning, and suffered from
24   depression.  Mr. Sandoval opined Plaintiff had a hard time following directions, got frustrated
25   easily, and did not remember well.  Based upon Plaintiff's office visits, Mr. Sandoval opined
26   Plaintiff could not work in a meaningful way.  (AR 459.)

27        **3.     The ALJ Provided Germane Reasons for Rejecting Mr. Sandoval's Opinion**

28        As a social worker, Mr. Sandoval is not considered an "acceptable medical source" under

the regulations; he is an "other source," and his opinion is treated as a lay opinion. *See Turner*, 613 F.3d at 1224. Accordingly, the ALJ must give germane reasons for rejecting Mr. Sandoval's opinion.

Plaintiff contends that, as a social worker with extensive firsthand contact with Plaintiff, Mr. Sandoval could document his behaviors and set functional limitations, such as difficulty following directions and remembering. (Doc. 16, 8.) Plaintiff asserts that Mr. Sandoval did not diagnose, but rather, observed, Plaintiff's behaviors and assessed his functioning, which was permissible pursuant to the Social Security Rulings. (Doc. 16, 8.) Plaintiff's argument that the ALJ's reasons for discrediting Mr. Sandoval's opinion were not "germane" is not convincing.

In his decision, the ALJ considered and discussed Mr. Sandoval's opinion, correctly noting that an opinion that someone is not employable is an administrative finding that is reserved to the Commissioner. (AR 28.) *See* 20 C.F.R. § 416.927(d)(1). As Mr. Sandoval started seeing Plaintiff in February 2001, the ALJ also found that there was insufficient evidence of a longitudinal treatment history to give validity to Mr. Sandoval's opinion. (AR 28.) *See* 20 C.F.R. § 416.927(c)(2)(i). Plaintiff articulates no reason that the ALJ's bases for discrediting Mr. Sandoval's opinion were not "germane."

In addition, Defendant correctly contends that even if the ALJ's reasons for rejecting Mr. Sandoval's opinion were not germane, any error was harmless. The harmless error analysis applies to an ALJ's failure to address lay witness testimony. *Molina v. Astrue*, 674 F.3d 1104, 1114-15 (9th Cir. 2012). Mr. Sandoval's report that Plaintiff had a hard time following directions, got frustrated easily, and did not remember well, were all based on Plaintiff's own subjective symptom testimony. The opinion essentially reiterated Plaintiff's statements. In his decision, the ALJ provided a valid basis for finding Plaintiff's testimony about his symptoms not credible, which Plaintiff does not challenge in his opening brief. (AR 27; Doc. 16.) In such a case, any error attributable to the lay witness statement is harmless. *Molina*, 674 F.3d at 1117 ("[w]here lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony, it would be inconsistent with our prior harmless error

1   precedent to deem the ALJ's failure to discuss the lay witness testimony to be prejudicial per

2   se."). *See Ramirez v. Astrue*, 803 F. Supp. 2d 1075, 1079 (C.D. Cal. 2011) (accepting the ALJ's

3   credibility finding where Plaintiff failed to challenge it and affirming the ALJ's rejection of lay

4   witness testimony that mirrored the plaintiff's testimony).

5       It is not adequate for Plaintiff to point out error; he has the burden to prove that the error

6   was harmful. *See Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009) ("the burden of showing that

7   an error is harmful normally falls upon the party attacking the agency's determination") (citing a

8   Social Security case with approval *Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997)).  Here,

9   the ALJ provided legally sufficient reasons for rejecting Plaintiff's testimony; thus, his failure, if

10  any, to discredit Mr. Sandoval's lay witness testimony is harmless.  *See Molina*, 674 F.3d at

11  1116-17 (citing *Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009)).

12      For the above reasons, the ALJ properly discredited Mr. Sandoval's opinion.

13  **C.      The ALJ's Vocational Analysis**

14      Plaintiff contends the ALJ erred because the ALJ (1) did not resolve conflicting findings

15  that Plaintiff had no past work and that Plaintiff could perform his past work as a dishwasher, (2)

16  did not meet his burden of proving Plaintiff was literate, and (3) relied on the Medical-Vocational

17  Guidelines ("Grids") rather than VE testimony in determining Plaintiff's ability to perform jobs.

18  (Doc. 16, 7, 9.)

19      The Commissioner responds that the ALJ properly relied upon a previous administrative

20  decision which indicated that Plaintiff had performed past work as a dishwasher, properly

21  considered Plaintiff's education as a vocational factor, and properly found Plaintiff was not

22  disabled using the Grids as a framework.  (Doc. 17, 13.)

23      **1.      Legal Standards**

24      In Step Four of the sequential analysis, the ALJ must determine whether the claimant has

25  a sufficient RFC, despite impairments or various limitations, to perform his past work.  20 C.F.R.

26  §§ 404.1520(f), 416.920(f).  If not, at Step Five of the sequential analysis, the burden shifts to the

27  Commissioner to show that the claimant can perform other jobs that exist in the national

28  economy. *Bray v. Comm'r Soc. Sec. Admin*., 554 F.3d 1219, 1222 (9th Cir.2009); *Hoopai v.*

*Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007).  To meet this burden, the Commissioner "must identify specific jobs existing in substantial numbers in the national economy that [the] claimant can perform despite [his] identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir.1999) (citation and internal quotation marks omitted).

### 2.    The ALJ's Findings

The ALJ determined Plaintiff had the RFC to perform medium work, but he could not climb ladders, ropes, or scaffolds; could occasionally stoop, crouch or crawl; must avoid concentrated exposure to pulmonary irritants and hazards; could only have occasional interaction with the general public; and was moderately to markedly limited in the ability to understand, remember, or carry out complex or detailed job instructions.  (AR 26.)

At Step Four the ALJ found that Plaintiff was able to perform his past relevant work as a "kitchen helper" as actually and generally performed.  (AR 29.)  The ALJ stated Plaintiff "ha[d] a marginal education and [was] able to communicate in English."  (AR 29.)  Further, transferability of job skills was not relevant because Plaintiff's past relevant work was unskilled.  (AR 29.)

At Step Five, the ALJ also made the alternative finding that Plaintiff could perform other jobs.  (AR 29.)  In doing so, the ALJ explained he considered Plaintiff's RFC, age, education, and work experience in conjunction with the Grids.  (AR 30.)  The ALJ explained that because Plaintiff had the RFC to perform the full range of medium work, considering his age, education, and work experience, a finding of "not disabled" was directed by Medical-Vocational Rule 203.25.  (AR 30.)

### 3.    The ALJ's Determination that Plaintiff Could Perform Past Relevant Work

Plaintiff contends the ALJ erred by initially finding that Plaintiff "ha[d] no past relevant work," and later finding that Plaintiff could perform his past relevant work as dishwasher, and failing to resolve the conflicting findings in the decision. (Doc. 16, 8-9; AR 26.)  Plaintiff contends the ALJ cited no evidence for concluding that Plaintiff had past relevant work as a dishwasher (Doc. 18, 2), while Plaintiff met his burden of showing he had no past relevant work at Step Four (Doc. 16, 8).  Plaintiff claims that because the Commissioner's response explains only that the dishwasher job was part of a prior administrative decision without providing (1)

1 explanation of the past work, (2) evidence that it constituted substantial gainful employment, or

2 (3) authority for the Court to affirm the ALJ's finding of past relevant work, the Commissioner

3 waived the issue of whether Plaintiff had past relevant work.  (Doc. 18, 2.)  Plaintiff contends that

4 the error at Step Four was harmful because the case then progressed to a Step Five analysis, at

5 which point the ALJ erred further.  (Doc. 18, 2.)

6      The Commissioner responds that the ALJ properly found that Plaintiff could perform his

7 past relevant work as a dishwasher at Step Four, pointing to a previous administrative decision in

8 which another ALJ noted that Plaintiff testified he had worked as a dishwasher at the substantial

9 gainful activity ("SGA") level in 2001.  (Doc. 17, 13.)  The Commissioner contends the ALJ

10 properly compared Plaintiff's RFC with the physical and mental demands of the prior work and

11 found that Plaintiff could perform it as actually and generally performed.  (Doc. 17, 13.)

12 However, even if the ALJ erred in his finding, such error was harmless given the ALJ's

13 alternative Step Five finding that Plaintiff could do other work in the national economy.  (Doc.

14 17, 14.)

15           **a.**     **Legal Standards**

16      Work experience is considered relevant if it was done within the last fifteen years, lasted

17 long enough for the claimant to learn to perform it, and constituted SGA.  *Vertigan v. Halter*, 260

18 F.3d 1044, 1051-52 (9th Cir. 2001); *see* 20 C.F.R. § 404.1565(a).  The burden is on the claimant

19 to prove that he cannot perform past relevant work.  *See Matthews v. Shalala*, 10 F.3d 678, 681

20 (9th Cir. 1993).

21      A claimant has the ability to return to previous work if he or she can perform the "actual

22 functional demands and job duties of a particular past relevant job" or "[t]he functional demands

23 and job duties of the [past] occupation as generally required by employers throughout the national

24 economy."  *Pinto v. Massanari*, 249 F.3d *40, 845 (9th Cir. 2001) (quoting SSR 82-61, 1982 WL

25 31387 (1981) (Titles II and XVI: Past Relevant Work – The Particular Job or the Occupation as

26 Generally Performed)).

27      This inquiry, as to whether a claimant may perform his past relevant work, does not

28 require the use of vocational testimony.  *See Crane v. Shalala,* 76 F.3d 251, 255 (9th Cir. 1996).

1   If a claimant has the residual functional capacity to do his or her previous work (the usual work

2   or other applicable past work), the ALJ will determine that the claimant is not disabled.  *See* 20

3   C.F.R. §§ 4040.1560(b)(3), 416.960(b)(3).

4               **b.     Analysis**

5        Plaintiff reported to the State Agency that over the past 15 years the totality of his work

6   experience was part time employment as a laborer through a temporary staffing service.  (AR

7   243.)  Plaintiff testified at his hearing that he last worked "picking up papers" three hours per

8   day, and he had no past relevant work.  (AR 53, 56.)

9        During Plaintiff's hearing, the ALJ indicated Plaintiff had no past relevant work.  (AR 53,

10  56.)  In the written decision, the ALJ again found Plaintiff had no past relevant work.  (AR 26.)

11  The ALJ explained that in a prior decision, Plaintiff was found to have performed past relevant

12  work as a laborer -- more than 15 years before the current proceedings.  (AR 26.)  The ALJ

13  reported that Plaintiff did some work in 2000, which fell below the substantial gainful

14  employment level.  (AR 26.)  However, at Step Four of the analysis, the ALJ found that

15  "[Plaintiff] is capable of performing past relevant work as a dishwasher."  (AR 29.)  The ALJ

16  explained that Plaintiff's past relevant work was most closely described as "kitchen helper,"

17  which requires light exertional capability and is unskilled.  (AR 29.)

18       In a prior disability proceeding, Plaintiff was found to have past relevant work as a

19  dishwasher in 2001, with no past relevant work before or since.  (AR 93-94.)  However, the ALJ

20  did not identify the prior proceeding, or any other evidence, as the basis for his finding that

21  Plaintiff had this past relevant work as a dishwasher.  (AR 29.)  In addition, the ALJ did not

22  acknowledge or resolve the ambiguity of his conflicting findings that Plaintiff did not have any

23  past relevant work, yet previously worked as a dishwasher.  (AR 26-29.)   The ALJ's conclusion

24  that Plaintiff's past relevant work included work as dishwasher or kitchen helper was not

25  supported by substantial evidence on the record as a whole.

26       While Plaintiff contends that the ALJ's error was not harmless because the ALJ then

27  proceeded to conduct a flawed Step Five analysis (Doc. 18, 2), the Commissioner claims that any

28  error was harmless given the ALJ's alternative finding that Plaintiff could do other work existing

1  in significant numbers in the national economy (Doc. 17, 14.)  However, as discussed below, the

2  ALJ's Step Five analysis was also flawed.

3          **4.      The ALJ's Consideration of Plaintiff's Literacy in the Vocational Analysis**

4          Plaintiff asserts that (1) the Commissioner did not meet her burden of proving Plaintiff is

5  literate, (2) Plaintiff's RFC was incomplete without inclusion of Plaintiff's illiteracy and limited

6  education, and (3) VE testimony was required to explain the significance of his illiteracy.  (Doc.

7  16, 9.)

8          The Commissioner responds that the ALJ properly considered Plaintiff's education as a

9  vocational factor by finding that Plaintiff had a marginal education and could communicate in

10  English.  (Doc. 17, 13.)  Further, the only evidence of Plaintiff's illiteracy is his own contention

11  that he could not read a newspaper.  Finally, the Commissioner asserts Plaintiff's contentions of

12  illiteracy are not relevant because the ALJ found Plaintiff could perform unskilled work, and the

13  regulations consider literacy as having the least impact on performing unskilled work.  (Doc. 17,

14  13.)

15              **a.      Legal Standards**

16          The Commissioner bears the burden at Step Five of proving that Plaintiff can perform

17  other work in the national economy, given his RFC, age, education and work experience.  20

18  C.F.R. § 416.912(g); *Silveira v. Apfel*, 204 F.3d 1257, 1261 n. 14 (9th Cir. 2000).   When

19  considering education as a vocational factor, the categories of education that are considered

20  include literacy and the ability to communicate in English.   *Id*. at 404.1564(b)(1), (b)(5);

21  416.964(b)(1), (b)(5).  A distinction exists between an assessment of literacy and an assessment

22  of the ability to communicate in English, and an ALJ must consider both in determining whether

23  a claimant can perform work pursuant to the regulations.  *Id*.; *see also Calderon v. Astrue*, No.

24  1:08-CV-01015 GSA, 2009 WL 3790008, at *9 (E.D. Cal. Nov. 10, 2009).

25          Literacy or education level is a vocational factor relevant only to the Step Five inquiry and

26  not to the existence of a disability.  *Silveira*, 204 F.3d at 1261 n. 14; *Elizondo v. Astrue*, 2010 WL

27  3432261*6 (E.D.Cal., Aug.31, 2010).  The Commissioner bears the burden of proving a claimant

28  is literate as part of his vocational analysis.  *Silveira*, 204 F.3d at 1261 n. 14.  Social Security

1  regulations divide education levels into four categories, two of which are relevant here.  First is

2  illiteracy, which is defined as the "inability to read or write." 20 C.F.R. § 416.964(b)(1).  "We

3  consider someone illiterate if the person cannot read or write a simple message such as instructions

4  or inventory lists even though the person can sign his or her name. Generally, an illiterate person

5  has had little or no formal schooling."  *Id.*  Second is marginal education, which by contrast,

6  means the claimant has a 6th grade level education or less. § 416.946(b)(2).

**b.      The ALJ Did Not Properly Evaluate Plaintiff's Literacy**

8          Plaintiff testified he quit school in seventh grade, had no GED, and could not read a

9  newspaper.  (AR 52, 54, 64.)  In Step Four, the ALJ found that Plaintiff had a marginal education

10  and was able to communicate in English.  (AR 29.)  The record does not clarify whether Plaintiff

11  is literate.  Plaintiff's first Function Report submitted in October 2009, which bears Plaintiff's

12  signature, states he "can't read."  (AR 223.)  A second, undated Function Report, purportedly

13  filled out by Plaintiff, speaks about Plaintiff in the third person ("now he has mental problems"),

14  and Plaintiff's grandmother's signature is crossed out on the signature line and replaced with

15  Plaintiff's name.  (AR 285.)  The answers within Plaintiff's second Function Report are very

16  similar to those submitted in a "Third Party Function Report"[3] describing Plaintiff's abilities and

17  activities, which was filed and signed by Plaintiff's grandmother.  These reports appear to suggest

18  Plaintiff's grandmother may have completed both forms.  *See, e.g.,* AR 281, 289.

19          The Commissioner contends that the only indication of Plaintiff's alleged illiteracy was

20  Plaintiff's testimony, which the ALJ properly discredited, therefore the ALJ did not have the

21  burden of proving Plaintiff was literate.  (Doc. 17, 13.)  However, the ALJ discredited only a

22  discrete portion of Plaintiff's testimony, finding, "[Plaintiff's] statements concerning the intensity,

23  persistence and limiting effects of [his] symptoms are not credible to the extent they are

24  inconsistent with the above [RFC] assessment."  (AR 27.)  Plaintiff's statement that he is unable to

25  read a newspaper was not part of the discredited testimony, and was not discussed by the ALJ.

26

27

28  [3] A "Third Party Function Report" is a document submitted to the Social Security Agency, in which a third party who knows the claimant describes their functional abilities.

1   The Commissioner bears the burden of proving Plaintiff is literate as part of the ALJ's

2   vocational analysis where, as here, Plaintiff has raised the question of his literacy.  *Silveira*, 204

3   F.3d at 1261 n. 14.  The ALJ made no finding as to Plaintiff's literacy at Step Five, stating only

4   that he is "able to communicate in English" at Step Four.  The ALJ did not make any other

5   findings relating to Plaintiff's literacy, and the record does not demonstrate Plaintiff's literacy.

6   Although the ALJ concluded Plaintiff was literate, substantial evidence did not support that

7   finding.  (AR 26.)

8        The Commissioner argues that Plaintiff's contentions of illiteracy are not relevant because

9   the ALJ found Plaintiff could perform unskilled work, and the regulations state literacy has the

10   least impact on performing unskilled work.  (Doc. 17, 13.)  The Commissioner's argument is

11   based on the presumption that the ALJ's application of the Grids, which state literacy has the

12   least impact on unskilled work, was appropriate.  *See* C.F.R. Pt. 404, Subpt. P, App. 2 §

13   202.00(g).  However, as discussed below, the ALJ was required to employ a VE to determine

14   potential work Plaintiff could perform.  The ALJ's failure to properly analyze Plaintiff's literacy

15   cannot be deemed harmless because, were Plaintiff illiterate, proper hypotheticals to the VE

16   would include illiteracy.  Upon remand the ALJ shall resolve the ambiguity of Plaintiff's literacy

17   and, if appropriate, include illiteracy in Plaintiff's RFC and in the vocational analysis at Step

18   Five.

19        **5.    The ALJ's Application of the Grids**

20        Plaintiff contends the ALJ erred by applying the Grids because Plaintiff had significant

21   non-exertional limitations.  (Doc. 16, 7.)  Plaintiff argues that Dr. Walker's opinion that Plaintiff

22   has the non-exertional impairment of knee pain was corroborated by x-rays and other physicians,

23   and therefore the ALJ was required to rely on VE testimony in his Step Five findings.  (Doc. 16,

24   7.)

25        The Commissioner responds that because the ALJ determined Plaintiff's non-exertional

26   limitations would have "little effect on the occupational base of unskilled medium work," and

27   therefore the occupational base was not significantly eroded by Plaintiff's non-exertional

28   limitations, the ALJ did not err in applying the Grids in concluding Plaintiff was not disabled.

(Doc. 17, 14.)

### a.      Legal Standards

Once a plaintiff has established an inability to perform past relevant work, at Step Five the burden shifts to the Commissioner to show that the plaintiff "can perform other substantial gainful work that exists in the national economy." *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989).   There are two ways for the Commissioner to meet the burden of showing the claimant can perform other jobs that exist in the national economy: "(a) by the testimony of a vocational expert, or (b) by reference to the Medical Vocational Guidelines ["Grids"] at 20 C.F.R. pt. 404, Subpt. P, app. 2." *Tackett*, 180 F.3d at 1099; *accord Lockwood v. Comm'r Soc. Sec. Admin*., 616 F.3d 1068, 1071 (9th Cir. 2010).   However, "[w]hen [the Grids] do not adequately take into account [a] claimant's abilities and limitations, the Grids are to be used only as a framework, and a vocational expert must be consulted." *Thomas v. Barnhart*, 278 F.3d 947, 960 (9th Cir. 2002).

The Grids "present, in table form, a short-hand method for determining the availability and numbers of suitable jobs for a claimant." *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006, as amended Nov. 7, 2006).   The Grids provide a matrix of rules that direct a conclusion about disability for various combinations of the four factors of age, education, previous work experience, and residual functional capacity. *See Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983) (discussing creation and purpose of the Grids); *Hoopai v. Astrue,* 499 F.3d 1071, 1075 (9th Cir. 2007).

Use of the Grids is appropriate only when a plaintiff's impairment "manifests itself by limitations in meeting the strength requirements of jobs ('exertional limitations'); [the Grids] may not be fully applicable where the nature of a claimant's impairment does not result in such limitations ('non-exertional limitations')." *Id*. at 1115.   Thus, "[w]here a claimant suffers only exertional limitations, the ALJ must consult the grids." *Id*.; *see Tackett*, 180 F.3d at 1102 ("The ALJ may rely on the grids alone  . . . only when the grids accurately and completely describe the claimant's abilities and limitations.") (internal quotation marks and citation omitted).   Application of the Grids is limited when, "despite having the residual functional capacity to perform a full

1   range of unskilled occupations at a given exertional level, a claimant may not be able to adjust to

2   these jobs because of non-exertional limitations." *Lounsburry*, 468 F.3d at 1115.  Nevertheless,

3   the Grids are consulted first to determine if a claimant is "disabled."  *See id*.  "In other words,

4   where a person with exertional and non-exertional limitations is 'disabled' under the grids, there

5   is no need to examine the effect of the non-exertional limitations, [b]ut if the same person is not

6   disabled under the grids, the non-exertional limitations must be examined separately."  *Id*. at

7   1116.

8        "Non-exertional limitations are limitations that do not directly affect a claimant's

9   strength."  *Burkhart,* 856 F.2d at 1340; 20 C.F.R. § 416.969a (1997).   Disabling pain is

10  considered a non-exertional limitation.  *Penny v. Sullivan*, 2 F.3d 953, 959 (9th Cir. 1993).  Once

11  a non-exertional limitation is found, if it is significantly disabling and affects plaintiff's ability to

12  complete work listed in the grids, reliance on the grids would be inappropriate and a vocational

13  expert should be used.  *Desrosiers v. Secretary of Housing & Health Services*, 846 F.2d 573, 577

14  (9th Cir. 1988).

15                    **b.    Analysis**

16       Plaintiff's RFC included the non-exertional limitation of no more than occasional

17  interaction with the general public, and the ALJ stated he was "moderately to markedly limited in

18  his ability to understand, remember, or carry out complex or detailed job instruction."  (AR 26.)

19  Despite Plaintiff's non-exertional limitations, the ALJ applied the Grids and found Plaintiff "not

20  disabled" pursuant to Medical-Vocational Rule 203.25.  (AR 30.)  Pursuant to Rule 203.25,

21  individuals who can perform work of medium exertion, are younger, have limited or less

22  education, with unskilled or no past work experience, are disabled.  20 C.F.R. Part 404, Subpt. P,

23  App. 2, Table No. 3.

24       While an alleged non-exertional impairment does not automatically preclude application

25  of the Grids, the ALJ must determine whether Plaintiff's non-exertional limitations significantly

26  limit the range of work permitted by his exertional limitations.  Here, the ALJ explained that

27  Plaintiff's "additional limitations have little effect on the occupational base of unskilled work,"

28  and "[the] fact that [Plaintiff] is limited to a reduced range of medium work and is limited to work

involving simple repetitive tasks would have very little effect on the occupational base when considering only unskilled work." (AR 30.) However, Plaintiff's RFC does not limit him to simple repetitive tasks. (AR 26.) Rather, although the ALJ noted in Plaintiff's RFC that he was moderately to markedly limited in his ability to apply complex instructions, the ALJ did not apply a related limitation. The ALJ's decision does not reconcile the conflicting assessments that, on the one hand, Plaintiff could perform a full range of medium work, with, on the other hand, Plaintiff's moderate to marked limitation in his ability to understand, remember, or carry out complex or detailed job instructions.

The Grids may be used only where they "completely and accurately represent a claimant's limitations." *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999); see *Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir. 1985). Accordingly, if a claimant suffers from non-exertional limitations, the ALJ may not apply the Grids because they are based on strength factors only. *See* 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(b); *see also* 20 C.F.R. §§ 404.1569a; 416.969a (defining non-exertional limitations as limitations that do not directly affect a claimant's [muscular] strength); *Desrosiers*, 846 F.2d at 576–77 (noting that a sufficiently severe, non-exertional impairment may limit a claimant's functional capacity in ways not contemplated by the guidelines, rendering the guidelines inapplicable and noting that pain, postural limitations, or environmental limitations are examples of non-exertional limitations).

Although the ALJ stated that the VE testimony was *not* required to reach a decision that Plaintiff could perform work, and that Plaintiff's limitations in mental functioning did not significantly diminish the occupational base, Plaintiff clearly suffered from significant non-exertional impairments. The ALJ described moderate to marked limitations in understanding and following directions, and limited Plaintiff to occasional contact with the general public, but did not include a corresponding limitation in Plaintiff's RFC. When, as here, a claimant suffers from non-exertional limitations, an ALJ cannot prove the existence of jobs available to that claimant by using the Grids and, instead, must prove such existence through expert vocational testimony. *Tackett*, 180 F.3d at 1101–02; *see also Thompson v. Sullivan*, 987 F.2d 1482, 1491–92 (10th Cir.

1   1993).  VE testimony was required to determine what, if any, job Plaintiff could perform.  Upon

2   remand, the ALJ shall obtain expert vocational testimony in Plaintiff's vocational analysis.

3   **D.      Remand is Required**

4        "The court shall have power to enter, upon the pleadings and transcript of the record, a

5   judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

6   with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In Social Security

7   cases, the decision to remand to the Commissioner for further proceedings or simply to award

8   benefits is within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir.

9   1989).  "If additional proceedings can remedy defects in the original administrative proceedings,

10  a social security case should be remanded.  Where, however, a rehearing would simply delay

11  receipt of benefits, reversal [and an award of benefits] is appropriate."  *Id*. (alteration in original)

12  (internal quotation marks omitted).  On the other hand, "[w]here there are outstanding issues that

13  must be resolved before a determination can be made, and it is not clear from the record that the

14  ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated,

15  remand is appropriate."  *Allen*, 2010 WL 4825925, at *8 (C.D. Cal. Nov. 2, 2010) (remanding the

16  case to the Commissioner after holding that the ALJ had violated the law of the case and the rule

17  of mandate doctrines) (citations omitted).

18        Here, due to Plaintiff's non-exertional limitations, VE testimony was required to ascertain

19  whether jobs exist in the national economy which Plaintiff could perform.  By not meeting his

20  burden of proving Plaintiff was literate, and in relying on the Grids despite Plaintiff's non-

21  exertional limitations, the Commissioner did not adequately satisfy the Step Five burden of

22  establishing that work existed in significant numbers in the national economy that Plaintiff could

23  perform.  Failure to ascertain Plaintiff's literacy or obtain VE testimony constitutes reversible

24  error.  The ALJ's errors were not harmless because they provided support for his conclusion that

25  Plaintiff was not disabled and could perform work.  The case must be remanded for further

26  consideration of these issues.

27  //

28  //

## VI.  CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case is REMANDED to the ALJ for further proceedings consistent with this order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Deon Broadway and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.


IT IS SO ORDERED.

Dated:   **August 26, 2014**                          **/s/ Sheila K. Oberto**
                                                    UNITED STATES MAGISTRATE JUDGE

27